UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
JUAN RAMOS BUSTILLO, *et al.*,

                         Plaintiffs,

               -against-

K&J CONSTRUCTION CONSULTANT
SERVICE, INC., *et al.*,

                        Defendants.
---------------------------------------------------------X
**POLLAK**, Chief United States Magistrate Judge:

        **REPORT AND**
     **RECOMMENDATION**
     20 CV 478 (RPK)(CLP)

       On January 28, 2021, plaintiffs Juan Ramos Bustillo ("Bustillo"), Victor Manuel Ramos

Acosta ("Acosta"), Santos Ramos Acosta ("Santos"), Josue Edgardo Isaula ("Isaula"), Ostilio

Ramos Bustillo ("Ostilio"), Yeison Lizandro Velasquez ("Velasquez"), Ronal Marel Padilla

Alonzo ("Alonzo"), Kevin Josue Sevilla ("Sevilla"), Bonerge Pacheco ("Pacheco"), and Raul

Mendoza ("Mendoza") (collectively, "plaintiffs") commenced this collective action against K&J

Construction Consultant Service, Inc. ("K&J"), D Z Image Inc. ("D Z"), Jenny Chiang

("Chiang"), and Wen Feng Zhang ("Zhang") (collectively, "defendants"), seeking damages for

minimum and overtime wages under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et

seq., and the New York Labor Law ("NYLL") § 650, et seq., N.Y. Comp. Codes R. & Regs. tit.

12 ("NYCRR") § 137-1.3, and for violations of the wage notice and wage statement

requirements, pursuant to NYLL §§ 195(1) and 195(3).

       Despite proper service, defendants failed to file an answer or respond to the Complaint

and on July 24, 2020, the Clerk of Court issued a Certificate of Default against the defendants.

(Aff.[1] ¶ 10).  By Notice of Motion dated March 19, 2021, plaintiffs moved for default judgment.

---

[1] Citations to "Aff." refer to plaintiff's Affirmation for Motion to Enter Default Judgment, filed on March

The motion was referred to the undersigned on May 17, 2021.

Plaintiffs, however, failed to support the motion for default judgment with proof of their damages and relied instead on an affirmation of plaintiffs' counsel attesting to plaintiffs' damages.  Thus, on November 10, 2021, the Court held an Inquest Hearing at which all 10 plaintiffs appeared and testified to the damages that they sustained.  On January 3, 2022, plaintiffs filed a memorandum updating their damages calculations in light of the plaintiffs' hearing testimony.  (ECF No. 26).  Given that defendants failed to attend the Inquest Hearing to challenge plaintiffs' testimony, the Court finds that plaintiffs' testimony was credible.

Therefore, for the reasons that follow, this Court respectfully recommends that plaintiffs be awarded damages in the amount of **$1,532,958.74**.

## FACTUAL BACKGROUND

Plaintiffs claim to have worked for defendants at various times between 2013 and 2020.  (Compl.[2] ¶¶ 47, 48, 57, 58, 67, 68, 72, 73, 77, 78, 82, 83, 87, 88, 92, 93).  Plaintiffs allege that defendant K&J is a New York corporation that operates a construction business based out of Greenlawn, New York.  (Compl. ¶ 18).  Defendant Chiang is alleged to be the owner and/or operator, Chairman of the Board, and Chief Executive Officer of K&J, responsible for all matters related to employees' rates and methods of pay and hours worked, with the power to hire and fire K&J's employees.  (Id. ¶¶ 20-26).  Plaintiffs allege that K&J's annual business exceeds $500,000 and that it is engaged in interstate commerce.  (Id. ¶ 38).

Plaintiffs further allege that defendant D Z is a New York corporation that operates a construction business based out of Brooklyn, New York.  (Id. ¶ 28).  Defendant Zhang is alleged

---

19, 2021, ECF No. 17.

[2] Citations to "Compl." refer to plaintiff's Collective Action Complaint, filed on January 28, 2020, ECF No. 1.

to be the owner and/or operator, Chairman of the Board, and Chief Executive Officer of D Z, responsible for all matters related to employees' rates and methods of pay and hours worked, with the power to hire and fire D Z's employees.  (Id. ¶¶ 30-36).  Plaintiffs allege that D Z's qualifying annual business exceeds $500,000 and that it is engaged in interstate commerce.  (Id. ¶ 39).  Plaintiffs allege that defendant Zhang makes personnel decisions, has the power to hire and fire employees, and has power over payroll decisions at both K&J and D Z.  (Id. ¶¶ 34-36).

In the Complaint, plaintiffs assert causes of action for failing to pay overtime wages under the FLSA and NYLL (First and Second Causes of Action); failing to pay minimum wages under the FLSA and NYLL (Third and Fourth Causes of Action); violating the notice and recordkeeping requirements of the NYLL (Fifth Cause of Action); and violating the wage statement requirements of the NYLL (Sixth Cause of Action).  (Id. ¶¶ 112-142).  The Complaint also asserts that this action should be certified as a collective action under the FLSA, 29 U.S.C. § 216(b), because defendants employed between 30 and 40 employees within the past three years who were "similarly titled personnel with substantially similar job requirements and pay provisions" and who were "subject to defendants' common practices, policies, programs, procedures, protocols and plans including willfully failing and refusing to pay required overtime wage compensation."  (Id. ¶¶ 100-103).

Following the filing of the Complaint, plaintiffs served the corporate defendant K&J on February 18, 2020, by serving a copy of the Summons and Complaint with the Authorized Agent for service in the Office of the Secretary of State.  (Aff. of Serv., ECF No. 9).  Defendant D Z was also served on February 18, 2020, through service of a copy of the Summons and Complaint with the Authorized Agent for service in the Office of the Secretary of State.  (Aff. of Serv., ECF No. 10).

On July 24, 2020, after defendants failed to answer or otherwise move with respect to the Complaint, the Clerk of Court entered a default.  (ECF No. 15).  Thereafter, plaintiffs filed a motion for default judgement.  On May 17, 2021, the matter was referred to the undersigned Magistrate Judge by the Honorable Rachel P. Kovner to prepare a Report and Recommendation as to damages.  Plaintiffs seek damages in the form of unpaid overtime wages, liquidated damages, interest, and attorney's fees and costs.

DISCUSSION

I.    <u>Default Judgment</u>

  A.    <u>Legal Standard</u>

Rule 55(a) of the Federal Rules of Civil Procedure provides that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default."  Fed. R. Civ. P. 55(a).  Rule 55 sets forth a two-step process for an entry of default judgment.  <u>See</u> <u>Enron Oil Corp. v. Diakuhara</u>, 10 F.3d 90, 95-96 (2d Cir. 1993).  First, the Clerk of Court enters the default pursuant to Rule 55(a) by notation of the party's default on the Clerk's record of the case.  <u>Id.</u>  Second, after the Clerk of Court enters a default against a party, if that party fails to appear or otherwise move to set aside the default pursuant to Rule 55(c), the court may enter a default judgment.  <u>See</u> Fed. R. Civ. P. 55(b).

The Second Circuit has cautioned that since a default judgment is an "extreme sanction[,]" it should only be entered as a last resort.  <u>See</u> <u>Meehan v. Snow</u>, 652 F.2d 274, 277 (2d Cir. 1981).  While the Second Circuit has recognized the "push on a trial court to dispose of cases that, in disregard of the rules, are not processed expeditiously [and] . . . delay and clog its calendar," it has held that the district court must balance that interest with its responsibility to "afford[] litigants a reasonable chance to be heard."  <u>Enron Oil Corp. v. Diakuhara</u>, 10 F.3d at

4

95-96.  Thus, considering the "oft-stated preference for resolving disputes on the merits[,]" default judgments are "generally disfavored[,]" and doubts should be resolved in favor of the defaulting party.  Id.  Accordingly, plaintiffs are not entitled to a default judgment as a matter of right simply because a party is in default.  See Erwin DeMarino Trucking Co. v. Jackson, 838 F. Supp. 160, 162 (S.D.N.Y. 1993) (noting that courts must "supervise default judgments with extreme care to avoid miscarriages of justice").

The Court has significant discretion to consider a number of factors in deciding whether to grant a default judgment, including:  (1) whether the grounds for default are clearly established;  (2) whether the claims were pleaded in the complaint, thereby placing the defendants on notice, see Fed. R. Civ. P. 54(c) (stating a "default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings");  King v. STL Consulting LLC, No. 05 CV 2719, 2006 WL 3335115, at *4-5 (E.D.N.Y. Oct. 3, 2006) (holding that Rule 54(c) is not violated in awarding damages that accrued during the pendency of a litigation, so long as the complaint put the defendant on notice that the plaintiff may seek such damages);  and (3) the amount of money potentially involved—the more money involved, the less justification for entering the default judgment.  Hirsch v. Innovation Int'l, Inc., No. 91 CV 4130, 1992 WL 316143, at *2 (S.D.N.Y. Oct. 19, 1992).  Additionally, the Court may consider whether material issues of fact remain, whether the facts alleged in the complaint state a valid cause of action, whether plaintiffs have been substantially prejudiced by the delay involved, and whether the default judgment might have a harsh effect on the defendants.  See Pacific M. Int'l Corp. v. Raman Int'l Gems, Ltd., 888 F. Supp. 2d 385, 393 (S.D.N.Y. 2012).

The burden is on the plaintiffs to establish their entitlement to recovery.  See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992), cert. denied, 506

U.S. 1080 (1993).  When a default judgment is entered, the defendants are deemed to have admitted all well-pleaded allegations in the complaint pertaining to liability.  See id.  For the purposes of an inquest, a court accepts as true all factual allegations in the complaint, except those claims relating to damages.  See Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981).

B.  Default Judgment Liability

In this case, plaintiffs allege that defendants violated the FLSA, the NYLL, and the NYCRR by failing to pay overtime wages for hours worked in excess of 40 hours per week. (Compl. ¶¶ 112-142).  Although plaintiffs allege in their Complaint that during the period of their employment, defendants routinely failed to pay them minimum wages for the hours that they worked under both the FLSA and the NYLL (id. ¶¶ 123-136), in the Default Judgment Motion, they only seek damages for the alleged overtime violations.  (See generally Memorandum of Law in Support of Default Judgment, ECF No. 18; see also Damages Calculations, ECF No. 18-5).  In addition, plaintiffs seek statutory damages based on defendants' failure to provide proper wage notices and wage statements, and liquidated damages.

1)  FLSA

To establish a claim under the FLSA, plaintiffs must prove the following:  (1) the defendant is an enterprise participating in commerce or the production of goods for the purpose of commerce; (2) the plaintiffs are "employees" within the meaning of the FLSA; and (3) the employment relationship is not exempted from the FLSA.  Edwards v. Community Enters., Inc., 251 F. Supp. 2d 1089, 1098 (D. Conn. 2003) (citing 29 U.S.C. §§ 206(a), 207(a); Tony & Susan Alamo Found.  v. Sec. of Labor, 471 U.S. 290, 295 (1985)).

A defendant is an "[e]nterprise engaged in commerce or in the production of goods for commerce" if the defendant is an enterprise that:

> has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and . . .  whose annual gross volume of sales made or business done is not less than $500,000.

29 U.S.C. § 203(s)(1)(A).

In their Complaint, plaintiffs allege that the corporate defendant K&J has been and continues to be an employer engaged in interstate commerce within the meaning of the FLSA.  (Compl. ¶¶ 38, 39, 40, 115, 126).  Plaintiffs further allege that corporate defendant K&J has had annual gross revenues not less than $500,000 and used goods produced in interstate commerce.  (Compl. ¶¶ 38, 40, 115, 126).  Plaintiffs also allege that corporate defendant D Z has been and continues to be an employer engaged in interstate commerce within the meaning of the FLSA.  (Compl. ¶¶ 39, 40, 115, 126).  Plaintiffs further allege that corporate defendant D Z has had annual gross revenues not less than $500,000 and used goods produced in interstate commerce.  (Id.)  Thus, in their Complaint, plaintiffs have adequately alleged that defendants K&J and D Z are covered enterprises under the FLSA.

The FLSA defines an "employee" as "any individual employed by an employer."  29 U.S.C. § 203(e)(1); Edwards v. Community Enters., Inc., 251 F. Supp. 2d at 1098.  An "employer" is "any person acting directly or indirectly in the interest of an employer in relation to an employee[.]"  29 U.S.C. § 203(d).  "Person" is defined as "an individual, partnership, association, corporation, business trust, legal representative, or any organized group of persons."  29 U.S.C. § 203(a).  To "employ" "includes to suffer or permit to work."  29 U.S.C. § 203(g).  The FLSA covers both "employees who in any workweek [are] engaged in commerce or

in the production of goods for commerce" and those persons who are "employed in an enterprise engaged in commerce or in the production of goods for commerce[.]"  29 U.S.C. § 206(a).

Plaintiffs allege in their Complaint that they were employees engaged in commerce and/or in the production of goods for commerce, as defined by the FLSA.  (Compl. ¶¶ 114, 125).  It follows, therefore, that for purposes of this default, plaintiffs qualify as "employees" under the FLSA.  Plaintiffs have also adequately alleged that defendants K&J, D Z, Chiang, and Zhang are "employers" for purposes of the FLSA.  Plaintiffs allege that defendant Chiang is the owner and/or operator, Chairman of the Board, and Chief Executive Officer of K&J, responsible for all matters related to employees' rates and methods of pay and hours worked, with the power to hire and fire K&J's employees.  (Id. ¶¶ 20-26).  Plaintiffs alleges that defendant Zhang is the owner and/or operator, Chairman of the Board, and Chief Executive Officer of D Z, responsible for all matters related to employees' rates and methods of pay and hours worked, with the power to hire and fire D Z's employees.  (Id. ¶¶ 30-36).  Plaintiffs allege that at all times relevant to this action, defendants employed plaintiffs and were jointly responsible for hiring, supervising, setting pay, and paying plaintiffs, and that they possessed the power to terminate plaintiffs.  (Id. ¶¶ 41-46).  Additionally, the Court does not find any basis for exempting the employment relationship at issue from any of the statutory provisions.[3]

Plaintiffs all allege that they routinely worked over 40 hours per week and were not paid at the appropriate overtime rates for the hours worked in excess of 40 hours per week.  (Id. ¶¶ 51, 56, 61, 66, 71, 76, 81, 86, 91, 96, 107, 116).

---

[3] See 29 U.S.C. § 213(a) setting forth the exemptions under the FLSA.

Thus, because defendants have defaulted, the Court accepts plaintiffs' uncontested allegations as true, and respectfully recommends that plaintiffs be deemed to have sufficiently set forth the necessary elements to state a claim under the FLSA.

    2) <u>NYLL Claims</u>

Plaintiffs also allege that defendants violated the NYLL.  Like the FLSA, the NYLL requires employers to pay overtime rates calculated at one-and-one-half times the employees' regular rate of pay for all hours worked in a week over 40 hours.  <u>See</u> 12 N.Y.C.R.R. § 142-2.2; <u>see, e.g.</u>, <u>Charvac v. M & T Proj. Mgrs. of N.Y., Inc.</u>, No. 12 CV 5637, 2015 WL 5475531, at *4-5 (E.D.N.Y. June 17, 2015); <u>see also</u> <u>Chawdhury v. Hamza Exp. Food Corp.</u>, No. 14 CV 0150, 2015 WL 5541767, at *4-5 (E.D.N.Y. Aug. 21, 2015), <u>adopted by</u> 2015 WL 5559873 (E.D.N.Y. Sept. 18, 2015).

To recover under the NYLL, plaintiffs must prove that they are "employees" and that the defendants are "employers" as defined by the statute.  <u>See</u> <u>Lauria v. Heffernan</u>, 607 F. Supp. 2d 403, 407 (E.D.N.Y. 2009).  Unlike the FLSA, the NYLL does not require that a defendant achieve a certain minimum in annual sales or business to be subjected to the law.  <u>See</u> N.Y. Lab. Law § 651(6) (defining employer as "any individual, partnership, association, corporation, limited liability company, business trust, legal representative, or any organized group of persons acting as employer").  Similarly, an employee is simply defined as "any individual employed or permitted to work by an employer in any occupation[.]"  N.Y. Lab. Law § 651(5).

In this case, plaintiffs' allegations that they were employed by defendants within the meaning of Section 190(2) of the NYLL (Compl. ¶¶ 120, 132), and that defendants willfully failed to pay overtime wages (<u>id.</u> ¶¶ 51, 56, 61, 66, 71, 76, 81, 86, 91, 96, 107, 121), suffice to establish a violation of the overtime wage requirements of the NYLL.

3)  Plaintiff's Other Claims

In addition to the overtime wage claims, plaintiffs raise several other claims under state law, which when viewed within the totality of the allegations of the Complaint, state claims for violations of wage notice and wage statement requirements.  A review of the allegations in the Complaint demonstrate that plaintiffs have stated a claim for violations of the Wage Theft Prevention Act, NYLL §§ 195(1) and 195(3), in that they never received the notice required by Section 195(1)(a), which defendants were obligated to provide plaintiffs within ten business days of hiring them (id. ¶ 138), or statements containing the information required by Section 195(3). (Id. ¶ 141).

Accordingly, based on these uncontested allegations, the Court respectfully recommends that plaintiffs be deemed to have adequately alleged the elements necessary to state those claims under the NYLL.

C.  Default Determination

Based upon a review of the allegations in the Complaint, which are undisputed at this time, the Court finds that plaintiffs have sufficiently established liability so as to warrant entry of a default judgment.  See 29 U.S.C. § 207(a)(1).

Here, it is beyond dispute that defendants are in default.  Although it appears that defendants were properly served with the Summons and Complaint, they failed to file an answer or otherwise respond to the pleadings.  Moreover, the failure by the corporate defendants to obtain counsel in this case constitutes a failure to defend because the corporate defendants, as corporations, cannot proceed in federal court pro se.  See Shapiro, Bernstein & Co. v. Continental Record Co., 386 F.2d 426, 427 (2d Cir. 1967) (per curiam) (stating that "it is settled law that a corporation cannot appear other than by its attorney"); see also Jones v. Niagara

10

Frontier Transp. Auth., 722 F.2d 20, 22 (2d Cir. 1983) (discussing the rationale for requiring corporations, as "artificial" entities, to appear through counsel only). Defendants also failed to respond to plaintiff's request that default be entered, see Hirsch v. Innovation Int'l, Inc., 1992 WL 316143, at *2 (holding that defendant's "default is crystal clear—it does not even oppose this motion"), and they did not submit papers in response to plaintiffs' motion for default judgment. Thus, plaintiffs' evidence on damages is undisputed.

Given the numerous opportunities afforded to defendants, and their apparent lack of interest in participating in these proceedings, the Court finds no compelling reason to delay the case any further. Accordingly, it is respectfully recommended that default judgment be entered against defendants K&J, D Z, Chiang, and Zhang.

D. Liability of the Individual Defendants

Plaintiffs bring claims against the corporate defendants K&J and D Z as well as individual defendants Chiang, who is alleged to own and/or operate K&J, and Zhang, who is alleged to own and/or operate D Z. (Id. ¶¶ 20, 30). Individuals may be held jointly and severally liable under the NYLL if they meet the statute's definition of an employer. Rodriguez v. Almighty Cleaning, Inc., 784 F. Supp. 2d 114, 128 (E.D.N.Y. 2011). This definition extends to "'any person . . . employing any individual in any occupation, industry, trade, business or service' or 'any individual . . . acting as [an] employer.'" Irizarry v. Catsimatidis, 722 F.3d 99, 117 (2d Cir. 2013) (quoting NYLL §§ 190(3), 651(6)). Courts apply a four-part test examining whether the individual "(1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; (4) and maintained employment records." Lauria v. Heffernan, 607 F.

Supp. 2d 403, 409 (E.D.N.Y. 2009) (quoting Herman v. RSR Servs. Ltd., 172 F.3d 132, 139 (2d

Cir. 1999) (internal quotation marks omitted).

Plaintiffs allege that defendant Chiang was responsible for all matters related to

employees' rates and methods of pay and hours worked at K&J, with the power to hire and fire

K&J's employees.  (Id. ¶¶ 24-26).  They claim that Zhang was responsible for all matters related

to employees' rates and methods of pay and hours worked at D Z, with the power to hire and fire

D Z's employees.  (Id. ¶¶ 30-36).  Plaintiffs also allege that, at all times relevant to this action,

defendants employed plaintiffs and were jointly responsible for hiring, supervising, setting pay,

and paying plaintiffs, and they possessed the power to terminate plaintiffs.  (Id. ¶¶ 41-46).

Taken together and drawing all reasonable inferences in favor of plaintiffs, the allegations

demonstrate that defendants Chiang and Zhang were employers within the meaning of the NYLL

and the FLSA and are jointly and severally liable with K&J and D Z for the judgment.

II.   Damages

  A.  Legal Standard

When a default judgment is entered, the defendants are deemed to have admitted all well-

pleaded allegations in the Complaint pertaining to liability.  See Greyhound Exhibitgroup, Inc. v.

E.L.U.L. Realty Corp., 973 F.2d at 158; Montcalm Publ'g Corp. v. Ryan, 807 F. Supp. 975, 977

(S.D.N.Y. 1992).  However, the plaintiff must still prove damages in an evidentiary proceeding

at which the defendants can contest the claimed damages.  See Greyhound Exhibitgroup, Inc. v.

E.L.U.L. Realty Corp., 973 F.2d at 158.  "While a default judgment constitutes an admission of

liability, the quantum of damages remains to be established by proof unless the amount is

liquidated or susceptible of mathematical computation."  Flaks v. Koegel, 504 F.2d 702, 707 (2d

Cir. 1974).

When a court enters a default judgment and the damages do not consist of a sum certain, the Federal Rules of Civil Procedure provide that: "The Court may conduct hearings or make referrals—preserving any federal statutory right to a jury trial—when, to enter or effectuate judgment, it needs to . . . determine the amount of damages[.]" Fed. R. Civ. P. 55(b)(2)(B). While "the court must ensure that there is a basis for the damages specified in a default judgment, it may, but need not, make the determination through a hearing." Fustok v. Conticommodity Servs., Inc., 122 F.R.D. 151, 156 (S.D.N.Y. 1988) (collecting cases), aff'd, 873 F.2d 38 (2d Cir. 1989).

Here, the Court held a hearing at which each of the ten plaintiffs testified on November 10, 2021 to determine the amount of plaintiffs' damages.

B. Damages Requested by Plaintiffs

1) Overtime Wages Under the FLSA and NYLL

Plaintiffs seeks reimbursement for the overtime wages that they should have received pursuant to both the FLSA and the NYLL. (See Compl. ¶¶ 112-122).

a) Bustillo Overtime Wages

Plaintiff Bustillo seeks overtime wages in the amount of $127,509.84 for the hours worked between July 2016 and November 2019. (Damages Mem.[4] at 5; Tr.[5] at 20:24-21:3). Throughout his employment, Bustillo "regularly" worked six days per week for 12 or more hours per day. (Tr. at 22:4-13). Bustillo testified that he worked for more than 12 hours approximately two to four days a week. (Tr. at 22:14-22:5). In total, plaintiffs estimate that Bustillo worked for

---

[4] Citations to "Damages Mem." refer to the Memorandum of Damages Upon Plaintiffs' Testimony at Inquest Hearing with Proposed Judgment filed on December 22, 2021, ECF No. 24.

[5] Citations to "Tr." refer to the transcript of the November 10, 2021 Inquest Hearing filed on November 18, 2021, ECF No. 22.

around 76 hours per week, or roughly 12.7 hours per day, six days a week.  (Damages Mem. at 5).  Thus, Bustillo worked approximately 36 hours of overtime per week during his employment with defendants.  (Id.)  The Court agrees with plaintiffs that this is a reasonable inference from Bustillo's testimony that he regularly worked 12 hours a day six days a week, but between two and four times per week worked more than 12 hours.

Bustillo claims that defendants paid him a flat rate of $200 per day in 2016 and, beginning in 2017, paid him $30 per hour.  (Tr. at 24:13-25:2; Damages Mem. at 5).  Defendants then raised Bustillo's hourly rate to $32 per hour in 2018.  (Tr. at 22:8-14; Damages Mem. at 5).

To calculate damages, the Court must first determine Bustillo's regular hourly rate. "Under the FLSA, the 'regular hourly rate of pay of an employee is determined by dividing his total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours actually worked[.]'"  Pineda v. Frisolino, Inc., No. 15 CV 3774, 2017 WL 3835882, at *10 (S.D.N.Y. Aug. 29, 2017) (quoting 29 C.F.R. § 788.109).  Under the NYLL, the regular rate is calculated "by dividing the employee's total weekly earnings, not including exclusions from the regular rate, by the lesser of 40 hours or the actual number of hours worked by that employee during the work week."  12 N.Y.C.R.R. § 146-3.5.  "In actions to recover unpaid minimum wages and overtime pay under both the FLSA and the NYLL, Plaintiffs may recover under whichever statute provides the greater relief."  Pineda v. Frisolino, Inc., 2017 WL 3835882, at *11 (citations omitted).  Here, the NYLL allows for the greater recovery for each of the plaintiffs, including Bustillo.  Thus, Bustillo's regular rate of pay under the NYLL would be determined by dividing his weekly wage by 40 hours, rather than by the 76 hours that he alleges to have worked each week.

Plaintiffs claim that Bustillo's regular hourly rate for 2016 was $30 per hour.  (Damages Mem. at 6).  They arrive at this rate by multiplying his daily earnings of $200 per day by the six days that he claimed to have worked in a week to arrive at his weekly earnings, and then dividing that number by 40 to arrive at the dollar amount that he would have received per hour in a 40-hour week.  (Damages Mem. at 6).  To arrive at Bustillo's overtime hourly rate for 2016, plaintiffs multiplied this regular hourly rate of $30 per hour by 1.5, which equals an overtime rate of $45 per hour.  (Id.).  The Court finds that these calculations are correct, and therefore, since Bustillo's regular hourly rate for 2016 was $30 per hour and his overtime rate for that year was $45 per hour, he is owed unpaid overtime for the year 2016.

For 2016, plaintiffs have calculated that Bustillo is owed a total of $42,087.60 in overtime pay.  (Id.)  They arrive at this figure by multiplying the $45 per hour that he was owed for hours worked over 40 hours in a week by 36 hours; they then multiplied this product by 4.33 weeks—which approximates the average number of weeks per month in a year—and then they multiplied that by the 6 months that Bustillo claimed to have worked in 2016.  (Id.)  In fact, if Bustillo worked for defendants from July 2016 through December 2016, that represents a total of 26 weeks and 2 days.[6]  Nassry v. St. Luke's Roosevelt Hosp., No. 13 CV 4719, 2016 WL 1274576, at *13 (S.D.N.Y. Mar. 31, 2016) (holding that Courts may take judicial notice of facts established by the calendar).  Using the number of weeks that Bustillo actually worked to calculate his damages, Bustillo is owed slightly more in overtime pay than requested.  Specifically, using the 26 weeks and two days that he actually worked, he would be entitled to receive $42,582.83, representing $45 per hour for overtime, for which he received no

---

[6] None of the plaintiffs claimed to have taken any time off and defendants have failed to challenge their testimony.  Thus, the Court has calculated their unpaid wages without consideration for vacations, holidays, sick days, or other time that the plaintiffs might have taken off from working.

compensation at all, multiplied by 36 hours of overtime per week for 26 weeks and two days (26.2857 weeks).  However, since Bustillo has only asked for $42,087.60, the Court finds that it is appropriate to limit his award for 2016 to the amount that he has requested.

For 2017, plaintiffs have calculated that Bustillo is owed a total of $28,058.40 in overtime pay for his work.  (Id.)  In arriving at this figure, plaintiffs first calculated Bustillo's hourly overtime rate.  Given that Bustillo claimed that he was paid a regular hourly rate of $30 an hour in 2017, plaintiffs calculate that his overtime rate of pay was $45 per hour.  (Id.)  The Court finds that, based on Bustillo's testimony, his regular rate in 2017 was $30 per hour and his overtime rate was $45 per hour.

Given that Bustillo claimed that he was paid $30 per hour for all hours that he worked in 2017, he is owed an extra $15 per hour for the hours of overtime that he worked that year.  (Id.) Plaintiffs arrive at a total of $28,058.40 in unpaid overtime wages for 2017 as follows: $15 an hour (the difference between what Bustillo was paid and what he was owed at his overtime rate), times 36 hours (the number of hours worked over 40 each week), times 4.33 weeks (the average number of weeks worked per month), times 12 months.  (Id.)

It is again unclear why plaintiffs multiplied 4.33 weeks by 12, which equals 51.96 weeks, instead of simply using the total number of weeks per year—there are 52 whole weeks in any given year—to perform their calculation.  Using the actual number of weeks in 2017, Bustillo would be entitled to $28,157.22, representing $15 an hour, times 36 hours of overtime per week, times 52 weeks and one day (52.143 weeks).  Since Bustillo has only asked for $28,058.40, however, the Court finds that it is appropriate to limit his award for 2017 to the amount that he has requested.

Following the same processes, plaintiffs claim that, for 2018, Bustillo is owed $29,928.96 in unpaid overtime compensation, representing $16 an hour (the difference between his regular rate of $32 per hour and his overtime rate of $48 per hour), times 36 hours (the number of hours worked over 40 each week), times 4.33 weeks, times 12 months.  (Id.)  Again, if Bustillo had calculated his damages using the 52 full weeks that elapsed in 2018 instead of multiplying 4.33 by 12 months, he would be entitled to a slightly higher award.  However, because Bustillo has only requested $29,928.96 in unpaid overtime compensation for 2018, the Court finds that it is appropriate to limit his award for 2018 to that amount.

Plaintiffs calculate that Bustillo is owed $27,434.88 for 2019, representing $16 per hour (the difference between his regular rate of $32 per hour and his overtime rate of $48 per hour), times 36 hours (the number of hours worked over 40 each week), times 4.33, times 11 months. (Id.)  During the period from January 1, 2019, through November 30, 2019, 47 weeks and five days elapsed, or 47.714 weeks.  Thus, again, Bustillo would be entitled to the slightly higher award for 2019 of $27,483.26, representing $16 per hour, times 36 hours, times 47.714 weeks, if he had calculated his lost earnings using the actual number of weeks that he claimed to have worked in 2019.  However, because Bustillo has requested the lower amount, the Court finds that it is appropriate to limit his award for 2019 to the requested amount.

Considering that plaintiff Bustillo's claims of hours worked and pay received have not been challenged by defendants and after having considered plaintiffs' calculations and Bustillo's testimony at the Inquest Hearing, the Court respectfully recommends that plaintiff Bustillo be awarded **$127,509.84**, representing the total amount of overtime owed for the entire period of his employment as follows:

| | |
|---|---|
| **2016** | $42,087.60 |

| | |
|---|---|
| **2017** | $28,058.40 |
| **2018** | $29,928.96 |
| **2019** | $27,434.88 |

TOTAL: $127, 509.84

    b)  <u>Acosta Overtime Wages</u>

Plaintiff Acosta seeks overtime wages in the amount of $15,761.20 for the 14 months that

he worked for defendants from June 2017 through December 2017 and from May 2019 through

November 2019.  (Damages Mem. at 3; Tr. at 8:10-19, 9:7-13).

Plaintiffs assert in their filings that Acosta regularly worked five days per week.[7]

(Damages Mem. at 3).  At the Inquest Hearing, Acosta testified that he usually began work at

7:00 a.m. and worked for 12 hours until 7:00 p.m.  (Tr. at 9:14-17-10:23).  He also claimed that

three or four days per week, defendants required that he work until 8:00 p.m. or 9:00 p.m.  (<u>Id.</u> at

11:3-17).  Plaintiffs thus estimate that Acosta regularly worked 66 hours per week, which

equates to 26 hours of overtime work each week.  (Damages Mem. at 3).  When Acosta worked

for defendants in 2017, he was paid $15 per hour.  (Tr. at 11:18-24; 13:5-14).  When Acosta

returned to work for defendants in May 2019, defendants raised his pay to $25 per hour.  (<u>Id.</u> at

12:1-3).

Plaintiffs calculate that, in 2017, Acosta should have been paid $22.50 per hour for the 26

hours of overtime that he worked each week, representing his regular rate of $15 per hour

multiplied by 1.5. (Damages Mem. at 3).  Since defendants paid him $15 an hour for all 66 hours

that he worked, Acosta claims that he is owed an additional $7.50 per hour for 26 hours per

---

[7] Counsel did not ask Acosta to confirm this during the Inquest Hearing, but since the requested damages for Acosta are based on a five-day workweek and the Court has not been presented with any evidence to question that assertion, the Court has based its calculations on the representation as to days worked set forth in the plaintiffs' Damages Memorandum.

week, representing unpaid overtime wages and amounting to a total of $195 in unpaid wages per week.  (Id.).  Acosta claims to have worked seven months during this period, and plaintiffs calculate that he is therefore owed $5,910.45 in unpaid wages for the time that he worked in 2017, representing $195, times 4.33, times 7 months.  (Id.)  The actual number of weeks that elapsed from June 1, 2017 through December 31, 2017, however, is 30 weeks and four days, or 30.571 weeks, and thus, if plaintiffs had accurately counted the number of weeks during this time, Acosta could have claimed $5,961.35 in damages, representing $195 per week in unpaid overtime compensation multiplied by 30.571 weeks.  Since Acosta has only requested $5,910.45 for the seven months that he claimed to have worked in 2017, the Court finds that it is appropriate to limit his award to that amount.

For 2019, when Acosta was paid at the regular rate of $25 per hour, plaintiffs calculate that defendants should have paid Acosta $37.50 per hour of overtime that he worked for the 26 hours of overtime that he claimed to have worked each week.  (Id.)  Instead, defendants paid him only his regular wage of $25 per hour for all hours that he worked.  (Id.)  Thus, Acosta is owed $12.50 per hour for the 26 hours of overtime that he worked per week in 2019, amounting to $325 in unpaid overtime wages per week.  (Id.)  Acosta worked seven months during this period as well, which plaintiffs calculate equates to $9,850.75 in unpaid overtime wages, representing $325 per week times 4.33 weeks times 7 months.  (Id.)  Again, plaintiffs calculate Acosta's unpaid overtime using a slightly lower number than the actual 30 weeks and four days that elapsed from May 1, 2019 through November 30, 2019.  However, because Acosta has only requested $9,850.75 for the seven months that he claims to have worked in 2019, the Court finds that it is appropriate to limit his award to that amount.  Therefore, in total, plaintiffs claim that

Acosta is owed $15,761.20 in unpaid overtime wages, representing $5,910.45 in unpaid overtime wages from 2017, and $9,850.75 in unpaid overtime wages from 2019.  (Id.)

Given that Acosta's claims of hours worked and pay received have not been challenged by defendants and having considered plaintiffs' calculations and Acosta's Inquest Hearing testimony, the Court respectfully recommends that plaintiff Acosta be awarded **$15,761.20,** representing the total amount of overtime owed for the entire period of his employment as follows:

| | |
|---|---|
| **2017** | $5,910.45 |
| **2019** | $9,850.75 |

TOTAL: $15,761.20

c)   Santos Overtime Wages

Plaintiff Santos seeks overtime wages in the amount of $102,205.32 for the hours worked between January 28, 2014 and November 2019.  (Damages Mem. at 4-5; Tr. at 15:1-9, 15:19-22).  Although Santos worked for defendants beginning in January 2013 (Tr. at 15:19-22), his claim is limited by the NYLL's six-year statute of limitations.  Shu Qin Xu v. Wai Mei Ho, 111 F. Supp. 3d 274, 278 (E.D.N.Y. 2015).  Plaintiffs' Complaint was filed on January 28, 2020, and thus January 28, 2014 is the earliest date for which Santos can recover unpaid overtime wages. See Pest v. Bridal Works of New York, Inc., 268 F. Supp. 3d 413, 432 (E.D.N.Y. 2017) (calculating the NYLL statute of limitations from that date when the Complaint was filed).

Santos testified that, throughout his employment with defendants, he usually worked five days per week.  (Tr. at 16:12-16).  "Generally," Santos worked 12 hours per day, beginning at 7:00 a.m. and "typically" finishing at 7:00 p.m.  (Id. at 16:2-4).  Between three and four days per week, however, defendants required Santos to stay after 7 p.m. and as late at 10 p.m.  (Id. at

16:5-11).  Plaintiffs estimate that Santos regularly worked 13.6 hours per day or 68 hours per

week, which equates to 28 hours of overtime work each week.  (Damages Mem. at 4).  The Court

agrees that this is a reasonable inference from Santos's Inquest Hearing testimony.

Santos testified that the defendants paid him $17 per hour in 2014;[8] $20 per hour in 2015

and 2016; $28 per hour in 2017 and 2018; and $30 per hour in 2019.  (Tr. at 19:3-9).  Plaintiffs

claim that based on the hourly rates that he was paid, Santos's overtime rate should have been

$25.50 per hour in 2014; $30 per hour in 2015 and 2016; $42 per hour in 2017 and 2018; and

$45 per hour in 2019.  (Damages Mem. at 4).  The Court agrees that these were Santos's

overtime rates from 2014 through 2019 based on Santos's testimony.

According to plaintiffs' calculations, Santos is owed $12,366.48 for overtime worked in

2014, representing $8.50 per hour of overtime, times 28 hours, over 40 in a workweek, times

4.33 weeks, times 12 months.  (Id.)  Plaintiffs claim that, for 2015 and 2016, Santos is entitled to

$10 an hour of overtime pay, times 28 hours per week, times 4.33 weeks, times 12 months,

equaling $14,548.80 per year for a total of $29,097.60.  (Id. at 5).  For 2017 and 2018, Santos is

owed an additional $14 per hour of overtime pay, times 28 hours, times 4.33 weeks, times 12

months, equaling $20,368.32 per year for a total of $40,736.64.  (Id.)  Finally, for 2019, plaintiffs

calculate that Santos is owed $15 per hour, times 28 hours, times 4.33 weeks, times 11 months,

for a total of $20,004.60.  (Id.)  Plaintiffs conclude that Santos is owed a total $102,205.32 in

unpaid wages, representing the sum of these calculations.  (Id.)

For 2014, while Santos claimed to have worked for the entire year, only 48 weeks and 2

days of that time fall within the statute of limitations.  Thus, for 2014, Santos is owed $11,492 in

---

[8] Santos also testified that he was paid $17 per hour in 2013.  However, he is barred from recovering for that time by the statute of limitations and has not requested damages for that year.

overtime wages, representing $8.50 per hour of overtime, times 28 hours over 40 in a workweek, times 48 weeks and 2 days (48.2857 weeks).  In failing to account for the period that falls outside the NYLL statutory period, plaintiffs have inflated what Santos is owed in 2014 by $874.48.

For the time that Santos claimed to have worked for defendants from 2015 through 2019, plaintiffs slightly undercount Santos's underpayment by multiplying 4.33 by the number of months that elapsed during that time instead of using the actual number of weeks per year that Santos worked for the defendants.  However, because Santos has requested a lower amount for each of these years, the Court finds that it is appropriate to limit his award to what he requested.

Thus, given that Santos's claims of hours worked and pay received have not been challenged by defendants and having considered plaintiffs' calculations and Santos's Inquest Hearing testimony, the Court respectfully recommends that plaintiff Santos be awarded **$101,330.84** as follows:

| | |
|---|---|
| **2014** | $11,492 |
| **2015** | $14,548.80 |
| **2016** | $14,548.80 |
| **2017** | $20,368.32 |
| **2018** | $20,368.32 |
| **2019** | $20,004.60 |
| | TOTAL: $101,330.84 |

    d)  <u>Isaula Overtime Wages</u>

Plaintiff Isaula seeks overtime wages in the amount of $330,921.04 for the hours worked from February 2016 through November 2019.  (Damages Mem. at 10-11; Tr. at 46:1-8).  Isaula claims to have worked for defendants six days per week; he regularly worked 12 hours a day,

Mondays through Fridays, and 10 hours on Saturdays.  (Tr. at 46-47:1-10).  Isaula testified, however, that "there would be times where they worked 9 or 10 hours" on weekdays and "sometimes they worked 13 hours."  (Id. at 46:12-16).

Plaintiffs rely on these statements to conclude that Isaula "regularly worked 72 hours per week," or an average of 12 hours a day.  (Damages Mem. at 10).  The Court finds, however, that this conclusion conflicts with Isaula's testimony, which is that he usually worked 12-hour days on the weekdays and 10-hour days on Saturday for a total of 70 hours a week.  Moreover, to the extent that Isaula occasionally worked 13-hour days during the week, he testified that he also sometimes worked nine- or 10-hour days, offsetting the days that he worked more than 12 hours. Thus, the Court finds that Isaula worked an average of 70 hours a week and was therefore entitled to 30 hours of overtime pay per week.

Isaula claims that when he began working for defendants in February 2016, they paid him a flat daily rate of $220 a day, no matter the number of hours that he worked.  (Tr. at 49:2-6, 51-52:1-3; Damages Mem. at 10).  "[A]pproximately five months" after he began working with defendants, in or around July 2016, defendants increased Isaula's pay to $240 per day but, beginning in November 2018, began docking his pay by $10 per day, claiming that they were not satisfied with his work.  (Tr. at 52:10-20, 53-54:1-7).  Thus, between November 2018 and November 2019, Isaula was effectively paid $230 per day.  (Id. at 54:14-20).

Plaintiffs calculate that Isaula's overtime rate of pay under the NYLL for the entirety of 2016 was $49.50 per hour, representing $220 per day, times six days, divided by 40 hours, equaling a regular rate of pay of $33 per hour, multiplied by 1.5 to arrive at Isaula's overtime rate.  (Damages Mem. at 10).  While the Court agrees with this calculation for part of 2016, plaintiffs neglect the fact that Isaula claimed that his pay increased around July 2016 to $240 per

day.  Thus, plaintiffs have miscalculated Isaula's overtime rate from July through December 2016.  Based on Isaula's testimony, for those months of 2016, he was entitled to an increased overtime hourly rate of $54 per hour, representing $240 per day, times six days, divided by 40 hours, equaling a regular rate of $36 per hour, multiplied by 1.5 to determine his overtime per-hour pay rate.  Since plaintiffs have only requested the lesser amount of $220 per day for the entirety of 2016, however, the Court finds that it is appropriate to limit Isaula's award accordingly.  Thus, the Court finds that, for the entirety of Isaula's employment with defendants in 2016, Isaula's regular rate of pay was $33 per hour and his overtime rate was $49.50 per hour as calculated by the plaintiffs.

For 2017, plaintiffs calculate that Isaula's regular hourly rate increased to $36 per hour, representing $240 per day, multiplied by six days, equaling Isaula's weekly pay, divided by 40 hours.  (Id. at 11).  Plaintiffs thus calculated that Isaula's overtime rate was $54 per hour in 2017, representing one-and-a-half times his regular rate of pay.  (Id.)  The Court finds that these calculations are correct and thus that Isaula's regular rate of pay in 2017 was $36 per hour and therefore, his overtime rate for that year was $54 per hour.

In calculating Isaula's overtime rate in 2018, plaintiffs calculate his rate as though he was paid $230 per day for the entirety of 2018, based on Isaula's testimony that during the year, defendants docked his pay by $10 a day.  Plaintiffs neglect to account for the fact that Isaula testified that he was actually paid $240 per day for the 10 months from January 2018 until November 2018, which he explained was when defendants began docking his pay.  (Compare id. with Tr. at 53-54:7).  Based on Isaula's testimony, he was entitled to $54 per hour of overtime worked from January 2018 through October 2018, representing $240 per day, times six days, divided by 40 hours, times 1.5.  Beginning in November 2018, when defendants docked his pay

by $10 a day, his overtime rate was reduced to $51.75 per hour of overtime worked, representing $230 times six days divided by 40 hours x 1.5.  However, because plaintiffs only request that Isaula's pay for 2018 reflect his having received $230 per day, the court limits his award accordingly.  Thus, the Court finds that for the entirety of 2018, Isaula's regular rate of pay was $34.50 per hour, representing $230 per day, times six days, divided by 40 hours, resulting in an overtime rate of pay was $51.75, representing one and a half times his regular rate.

For 2019, when Isaula testified that he was paid $230 per day, plaintiffs calculate that Isaula's regular rate of pay was $34.50 per hour, representing $230 per day, times six days, divided by 40 hours, and thus his overtime rate was $51.75, representing his regular rate multiplied by 1.5.  (Id.)  The Court agrees that this is the correct calculation, and thus finds that for 2019 Isaula's regular rate of pay was $34.50 per hour and his overtime rate was $51.75.

Since Isaula was paid at a daily rate, he did not receive any overtime compensation for any of the hours over 40 that he worked in a week.  Thus, based on plaintiff Isaula's testimony, from February through December of 2016, Isaula is owed $71,067.65 in unpaid overtime compensation, representing $49.50, times 30 hours of overtime, times 47 weeks and six days (47.857 weeks).  For 2017, Isaula is owed $84,471.66, representing $54, times 30 hours of overtime, times 52 weeks and one day (52.143 weeks).  For 2018, Isaula is owed $80,952.01, representing $51.75, times 30 hours of overtime, times 52 weeks and one day (52.143).  For the 11 months that Isaula worked for defendants in 2019, he is owed $74,075.99, representing $51.75 times 30 hours overtime times 47 weeks and five days (47.714 weeks).

Accordingly, given that Isaula's claims of hours worked and pay received have not been challenged by defendants and having considered plaintiffs' calculations and Isaula's Inquest

Hearing testimony, this Court respectfully recommends that Isaula be awarded **$310,567.31** in unpaid overtime wages as follows:

| | |
|---|---|
| **2016** | $71,067.65 |
| **2017** | $84,471.66 |
| **2018** | $80,952.01 |
| **2019** | $74,075.99 |
| | TOTAL: $310,567.31 |

e) <u>Ostilio Overtime Wages</u>

Plaintiff Ostilio seeks overtime wages in the amount of $69,678.36 for the overtime hours worked for defendants from February 2016 through January 2020.  (Tr. at 29:23-25, 30:12-14; Damages Mem. at 7-9).  Ostilio claims that he worked for defendants six days per week.  (Tr. at 32:8-20).  For two days every week, Ostilio worked 12 hours a day.  (<u>Id.</u> at 32:18-20).  For the remaining four days per week, Ostilio worked more than 12 hours, beginning at 7:00 a.m. and finishing at "8:00 or 9:00" p.m. "and sometimes at 10:00" p.m.  (<u>Id.</u> 31:20-32:1).  Plaintiffs conclude from Ostilio's testimony that he "regularly" worked 76 hours per week, which equates to 36 hours of overtime each week.  (Damages Mem. at 7).  The Court agrees with plaintiffs that this is a reasonable conclusion from Ostilio's testimony.

Ostilio also testified that, when he began working for defendants in 2016, he was paid $15 an hour.  (Tr. at 33:24).  In 2017, defendants increased Ostilio's hourly rate to $19 an hour, and, in 2019, increased his wages again to $21 an hour.  (<u>Id.</u> at 33:24-34:5).  While Ostilio was paid for all the hours that he worked, he was not paid time and a half for the hours that he worked over 40 hours a week.  (<u>Id.</u> at 33:8-18).

Plaintiffs calculate that, for the overtime hours that he worked from February through December of 2016, Ostilio is owed $12,860.10.  (Damages Mem. at 7).  This is calculated by taking the difference between his overtime rate and regular rate of pay, which equals $7.50 per hour (his regular rate of $15 per hour divided in half), times 36 hours of overtime, times 4.33 weeks, times 11 months.  (Id.)  Although 4.33 weeks multiplied by 11 months yields 47.63 weeks, in fact, there were 47 weeks and six days, or 47.857 weeks, that elapsed between February through December of 2016.  Since plaintiffs have requested a lower amount than the amount to which Ostilio would be entitled if plaintiffs had calculated his lost earnings using the actual number of weeks that he claimed to have worked in 2016, the Court finds that it is appropriate to award Ostilio the requested amount.

For each of 2017 and 2018, plaintiffs calculate that Ostilio is owed $17,770.32, representing $9.50 per hour (the difference between his overtime rate and his regular rate for those two years), times 36 hours of overtime, times 4.33, times 12 months per year, for a total of $47,032.64 when the unpaid wages for both years are combined.  (Id. at 7-8).  For 2019, plaintiffs calculate that he is owed $19,640.88, representing $10.50 per hour times 36 hours of overtime times 4.33 weeks times 12 months.  (Id. at 8).  Again, for each of these years, Ostilio would be entitled to a slightly higher award if plaintiffs had used the actual number of weeks that elapsed each year, which is 52 full weeks per year as opposed to plaintiffs' method which results in a slightly lower number—51.96 weeks per year—to calculate Ostilio's damages.  However, because the plaintiffs have requested a lower amount for each year, the Court finds that it is appropriate to limit Ostilio's award accordingly.

For the final month of January 2020, plaintiffs calculate that Ostilio is owed $1,636.74, representing $10.50 per hour, times 36 hours of overtime, times 4.33 weeks.  (Id.)  Four weeks

and three days elapsed in January 2020, or 4.43 weeks, and thus, again, Ostilio would be entitled to a slightly larger award, if he had requested damages reflecting that actual number of weeks that elapsed in January 2020.  Since Ostilio has requested a lower award for January 2020, the Court finds that it is appropriate to limit his award accordingly.

Considering that Ostilio's claims have not been challenged by defendants and having considered plaintiffs' calculations and Ostilio's testimony at the Inquest Hearing, the Court respectfully recommends that plaintiff Ostilio be awarded **$69,678.36**, representing the total amount of overtime owed for the entire period of his employment as follows:

| | |
|---|---|
| **2016** | $12,860.10 |
| **2017** | $17,770.32 |
| **2018** | $17,770.32 |
| **2019** | $19,640.88 |
| **2020** | $1,636.74 |

TOTAL: $69,678.36

   f)   Velasquez Overtime Wages

Plaintiff Velasquez seeks overtime wages in the amount of $3,166.31 for the overtime hours worked for defendants between August 2019 and October 2019.  (Tr. at 70:16-22, 70:23-72:2; Damages Mem. at 14).  Velasquez claimed during his testimony that he "almost always" worked five days a week for "between 10 and 12 hours a day."  (Tr. at 72:23-73:1).  When plaintiffs' counsel questioned him further, however, he claimed to have worked six days a week "[a]bout half the time."  (Id. at 73:2-11).  Velasquez testified that defendants paid him $18.75 per hour but he did not recall whether defendants ever increased his wage rate.  (Id. at 74:20- 23).

According to Velasquez, he was paid $18.75 an hour no matter how many hours he worked.  (Id. at 75:10-19).

Plaintiffs conclude from Velasquez's testimony that he "regularly" worked "an average of 5.5 days per week" from 7:00 a.m. to 7:00 p.m., for a total of 66 hours per week, "which equates to 26 hours of overtime work each week."  (Damages Mem. at 14).  While the Court agrees that Velasquez's testimony supports a finding that he worked on average 5.5 days a week, representing an even split between working five and six days a week, Velasquez claimed to have worked "between" 10 and 12 hours a day, not 12 hours a day.  Thus, a more reasonable inference from his testimony is that he worked an average of 11 hours a day, representing an even split between working 10 and 12 hours a day, and that he did so an average of 5.5 days a week for a total of 60.5 hours per week, amounting to 20.5 hours of overtime.

Accordingly, after reviewing plaintiffs' calculations and hearing Velasquez's uncontested testimony, the Court respectfully recommends that Velasquez be awarded **$2,527.27**.  This amount is calculated by taking the amount he should have been paid for overtime hours—$28.13 per hour, which represents time and a half of his regular rate of $18.75—multiplied by 20.5 hours of overtime per week, and subtracting the amount that he was actually paid, to get a total of $192.29 owed per week in overtime compensation.  Multiplying that weekly amount by the number of weeks that elapsed from August through October of 2019, which was 13 weeks and one day (13.143 weeks), Velasquez is owed $2,527.27.

g)  Alonzo Overtime Wages

Plaintiff Alonzo seeks overtime wages in the amount of $19,052 for the hours worked from January 2019 through November 2019.  (Compl. ¶ 77; Tr. at 56:24-57:10; Damages Mem. at 11-12).  Alonzo testified that he worked six days a week for between 12 and 14 hours a day.

29

(Tr. at 58:7-25).  Plaintiffs infer from Alonzo's testimony that he "regularly worked 72 hours per week," or 12 hours a day for six days a week, equaling 32 hours of overtime per week. (Damages Mem. at 12).  Although Alonzo's testimony lends itself to the interpretation that Alonzo worked between 12 and 14 hours a day for an average of 13 hours a day and a total of 78 hours a week, equaling 38 hours of overtime per week, plaintiffs only seek to collect overtime compensation for 12-hour workdays.  Thus, the Court finds that it is appropriate to limit Alonzo's award accordingly.  Alonzo claims that he was paid $25 per hour regardless of whether he worked overtime.  (Tr. at 59:7-8, 60:19-24).

Since he only received his regular rate of pay for all the hours that he worked, he is owed an overtime premium of $12.50 per hour for the 32 hours of overtime that he worked each week. Based on a calculation of $12.50, times 32 hours of overtime, times the 47 weeks and five days (47.714 weeks) that elapsed from January 2019 through November 2019, plaintiff Alonzo would be owed a total of $19,085.60.  However, plaintiffs only request the lesser amount of $19,052.00. Accordingly, after reviewing the plaintiffs' calculations and Alonzo's uncontested testimony, the Court respectfully recommends that plaintiff Alonzo be awarded the requested amount of **$19,052.00**, representing the total amount owed for his entire employment.

### h)  Sevilla Overtime Wages

Plaintiff Sevilla seeks overtime wages in the amount of $56,134.12 for the overtime hours worked from November 2016 through November 2019.  (Tr. at 63:1-12; Damages Mem. at 12).  Sevilla testified that he usually worked six days per week.  (Tr. at 63:22-24).  He claimed that he usually worked for 12 hours a day, four days a week, and 10 hours a day for the remaining two days, for a total of 68 hours per week, totaling 28 hours of overtime per week. (Id. at 63:19-67:2; Damages Mem. at 12).

According to Sevilla, beginning in 2016, defendants paid him $18.75 per hour regardless of the number of hours that he worked.  (Tr. at 64:13-16).  However, Sevilla also claimed that in 2016, he received a daily rate of "about 150, then it went up to 170, then 180, then 200."  (Id. at 64:23-65:11).  Sevilla failed, however, to identify when during the year these increases occurred. Since the Court is unable to determine for how long Sevilla was paid the flat daily rates that he testified to having received in 2016 and he initially claimed that he was paid $18.75 per hour that year, the Court respectfully recommends that the District Court find that he was paid $18.75 per hour for all hours worked in 2016.  Thus, the Court finds that, for 2016, Sevilla is owed an additional $9.38 per hour of overtime that he worked for a total of $2,288.65, representing $9.38, times 28 hours of overtime, times eight weeks and five days (8.714 weeks).

Sevilla testified that in January 2017, defendants increased Sevilla's pay to $21 per hour; in 2018, they increased his hourly rate to $22 per hour; and in 2019, they increased his rate again to $25 per hour.  (Id. at 64:15-22, 65:5-11).  For 2017, plaintiffs calculate that Sevilla is owed $15,276.24, representing $10.50, times 28 hours of overtime, times 4.33 weeks, times 12 months. (Damages Mem. at 13). For 2018, plaintiffs calculate that Sevilla is owed $16,003.68, representing $11, times 28 hours of overtime, times 4.33 weeks, times 12 months.  (Id.)  Again, because 52 full weeks elapse in any given year and plaintiffs calculate Sevilla's damages for 2017 and 2018 using a slightly lower number of weeks, plaintiffs' figures for 2017 and 2018 are slightly less than they would be if they had used the actual number of weeks that elapsed in these years.  However, since plaintiffs have requested lower figures for 2017 and 2018 than what Sevilla would be entitled to if the plaintiffs had calculated his award for those years using the actual number of weeks that he claimed to have worked, the Court finds that it is appropriate to limit Sevilla's award accordingly.

For 2019, plaintiffs calculate that Sevilla is owed $16,670.50, representing $12.50, times 28 hours of overtime, times 4.33 weeks, times 11 months.  (Id.)  In fact, a total of 47 weeks and five days, or 47.714 weeks, elapsed from January through November 2019.  Thus, Sevilla would be entitled to $16,699.90 for 2019, representing $12.50, times 28 hours, times 47.714 weeks, if plaintiffs had calculated his award for that year using the actual number of weeks that elapsed during his employment.  However, since Sevilla is only requesting $16,670.50 for 2019, the Court finds that it is appropriate to limit his award for 2019 to that amount.

Accordingly, after having reviewed the plaintiffs' calculations and Sevilla's uncontested testimony, the Court respectfully recommends that plaintiff Sevilla be awarded **$50,239.07**, representing the total amount owed for his entire employment as follows:

| | |
|---|---|
| **2016** | $2,288.65 |
| **2017** | $15,276.24 |
| **2018** | $16,003.68 |
| **2019** | $16,670.50 |

TOTAL: $50,239.07

i)   Pacheco Overtime Wages

Plaintiff Pacheco seeks overtime wages in the amount of $9,794.52 for the hours worked from December 2017 through November 2018.  (Tr. at 35:25-36:17; Damages Mem. at 8).  According to Pacheco, he was paid $13 per hour for the entire course of his employment with defendants.  (Tr. at 37:14-17).  Thus, plaintiffs calculate that Pacheco was owed $19.50 per overtime hour that he worked, or $6.50 per overtime hour in addition to his regular rate of pay which he received for all hours worked.  (Damages Mem. at 8-9).

Pacheco testified that he worked five or six days per week for "between 10 and 12 hours" a day, clarifying when questioned further that he worked on Saturdays, and thus six days a week, "two to three" times per month. (Tr. at 36:18-37:9). In asserting that Pacheco worked 12 hours per day every day, plaintiffs ignore Pacheco's testimony in which he claimed to work between 10 and 12 hours per day. (Damages Mem. at 8). Given that Pacheco testified that he worked "between 10 and 12 hours" a day, a more reasonable conclusion from his testimony is that he worked an average of 11 hours per day.

Similarly, plaintiffs ignore Pacheco's testimony that he worked six days per week two weeks per month, as well as three weeks per month on occasion, and conclude that he worked an average of 5.75 days per week, representing the average number of days worked as if he always worked six days a week, three times per month. (Id. at 8). A more reasonable interpretation of Pacheco's testimony is that, on average, he worked six days a week, 2.5 times per month, i.e., "two or three" times per month as he testified, and thus he worked an average of 5.625 days per week, representing his working five days, 1.5 times per month, and six days, 2.5 time per month, where a month is assumed to have four full weeks. Therefore, while plaintiffs calculate that Pacheco worked an average of 69 hours per week, the Court finds that a more reasonable conclusion from Pacheco's testimony is that he worked an average of approximately 62 hours a week, representing his working an average of 11 hours a day times 5.625 days a week, and equating to 22 hours of overtime per week.

Accordingly, after having reviewed plaintiffs' calculations and Pacheco's uncontested testimony, the Court respectfully recommends that plaintiff Pacheco be awarded **$7,456.45**, which is the product of $6.50 times 22 hours of overtime a week times 52 weeks and one day

(52.143 weeks), which is the number of weeks that elapsed from December 1, 2017, up to and

including November 30, 2018, and represents the total amount owed for his entire employment.

j)  <u>Mendoza Overtime Wages</u>

Plaintiff Mendoza seeks overtime wages in the amount of $20,405.19 for the hours that

he worked from December 2017 through December 2018.  (Tr. at 40:1-23; Damages Mem. at

10).  Mendoza testified that he worked six days a week, between two and three times a month,

for between 10 and 12 hours a day.  (Tr. at 40:24-41:16).  Mendoza testified that he was paid $25

per hour for each hour that he worked for the entirety of his employment with defendants.  (<u>Id.</u>

41:25-42:14).  Thus, plaintiffs calculate that his overtime rate of pay was $37.50 per hour, and

that he was therefore owed $12.50 in addition to what he received for each hour of overtime

work.  (Damages Mem. at 9-10).

Plaintiffs commit the same errors calculating Mendoza's unpaid overtime as they did

when calculating Pacheco's unpaid overtime; they assert that Mendoza worked for 12 hours per

day every day that he worked for defendants and that he always worked six days a week, three

times per month.  (<u>Id.</u> at 9).  Thus, according to plaintiffs, Mendoza regularly worked 69 hours

per week, equating to 29 hours of overtime per week.  (<u>Id.</u>)  Since Mendoza testified that he

worked between 10 and 12 hours per day, however, this Court finds that he worked on average

11 hours per day, not 12.  Moreover, because Mendoza claimed that he worked six days a week,

between two and three times per month, this would mean that he worked an average of 5.625

days per week each month, not 5.75 days.  Thus, Mendoza worked an average of approximately

62 hours per week equating to 22 hours of overtime per week, representing his working on average 11 hours a day, 5.625 days per week.

Accordingly, after having reviewed plaintiffs' calculations and Mendoza's uncontested testimony, the Court respectfully recommends that plaintiff Mendoza be awarded **$15,557.03**, which is the product of $12.50 per hour, times 22 hours, times 56 weeks and four days (56.571 weeks), which is the number of weeks from December 1, 2017, up to and including December 31, 2018, representing the total amount owed for his entire employment.

2) <u>Wage Statement Violation Penalties</u>

Under the NYLL, employers are required to give each employee a notice of their rate of pay at the time of hiring.  NYLL § 195(1)(a).  This notice must contain the rate or rates of pay, whether the employee was to be paid by the hour, shift, day, or week, any allowances claimed as part of the minimum wage, the regular pay day, the name of the employer, the physical address of the employer's main office, and the employer's telephone number in both English and the employee's primary language, if different from English.  <u>Id.</u>  Plaintiffs allege that they were never provided with such a notice.  (Compl. ¶ 138; <u>see generally</u> Tr.).

Also, under the NYLL, employers are required to give each employee a wage statement listing various specific pieces of information with each paycheck.  <u>See</u> NYLL § 195(3).  Although some plaintiffs in this case claimed to have received an informal accounting of the hours that they worked, plaintiffs uniformly assert that they never received wage statements during the time of their employment with defendants that complied with NYLL § 195(3).  (Compl. ¶ 141; <u>see</u> Tr. 12:17-22, 17:24-18:5, 23:19-24, 33:6-15, 37:22-38:14, 42:15-43:3, 50:12-51:14, 60:14-18, 66:6-10, 73:21-12, 75:1-2).

The New York Legislature created a private cause of action for violations of Sections 195(1) and 195(3) that became effective on April 9, 2011.  Perez Garcia v. Hirakegoma Inc., No. 17 CV 7608, 2020 WL 1130765, at *10 (S.D.N.Y. Mar. 9, 2020); Martinez v. Alimentos Saludables Corp., No. 16 CV 1997, 2017 WL 5033650, at *19-20 (E.D.N.Y. Sept. 22, 2017). Under the 2011 statutory scheme, an employee who did not receive a notice complying with Section 195(1)(a) of the NYLL at the time that the employee was hired was permitted to recover statutory damages of $50 per week that the violations continued, up to a total of $2,500. Martinez v. Alimentos Saludables Corp., 2017 WL 5033650, at *19-20.  This amendment was not applied retroactively, and thus employees who were hired before April 2011 were not entitled to recover damages for the violations of Section 195(1)(a), as no private cause of action existed under the original statute.  Id.; Rivera v. Harvest Bakery Inc., No. 13 CV 691, 2018 WL 4214337, at *10 (E.D.N.Y. Aug. 17, 2018), report and recommendation adopted, No. 13 CV 691, 2018 WL 4211301 (E.D.N.Y. Sept. 4, 2018).

This statutory scheme was amended in 2014, and, effective February 27, 2015, plaintiffs could recover $50 per day for each workday during which the employer failed to provide proper notice under Section 195(1), not to exceed $5,000.  See Cabrera v. 1560 Chirp Corp., No. 15 CV 8194, 2017 WL 1289349, at *7 (S.D.N.Y. Mar. 6, 2017) (citing 2014, N.Y. LAWS ch. 537, § 2, eff. Feb. 27, 2015, amending NYLL § 198(1-b)).  However, because violations of Section 195(1) occur at the time of hiring and the amendments raising the award limit do not apply retroactively, employees who began working after April 9, 2011 but prior to February 27, 2015 are only entitled to recover $50 a week up to a cap of $2,500.  Martinez v. Alimentos Saludables Corp., 2017 WL 5033650, at *21.

Under the statutory scheme in place between April 9, 2011, and February 27, 2015,
violations of Section 195(3) resulted in damages of $100 per workweek, for a maximum of
$2,500.  Perez Garcia v. Hirakegoma Inc., No. 17 CV 7608, 2020 WL 1130765, at *10
(S.D.N.Y. Mar. 9, 2020).  In the same amendment that modified the award available under
Section 195(1) and that became effective on February 27, 2015, the New York Legislature
increased the maximum recoverable amount for violations of Section 195(3) so that employees
could recover $250 for each workday for which an employer fails to provide the employee with a
wage statement, not to exceed $5,000.  NYLL § 198(1-d).

Unlike Section 195(1), however, violations of Section 195(3) occur each time that a
defendant fails to provide a proper wage statement with the payment of wages.  Gamero v.
Koodo Sushi Corp., 272 F. Supp. 3d 481, 511 n. 14 (S.D.N.Y. 2017), aff'd, 752 F. App'x 33 (2d
Cir. 2018).  Thus, an employee that began working prior to the 2015 amendment but continued
to work after the 2015 amendment became effective could potentially recover damages up to the
$5,000 statutory limit under the amended statutory scheme.  Lu v. Nisen Sushi of Commack,
LLC, No. 18 CV 7177, 2020 WL 9814084, at *10 (E.D.N.Y. Mar. 14, 2020) (citing Elvey v.
Silver's Crust W. Indian Rest. & Grill, Inc., No. 18 CV 126, 2019 WL 3937126, at *13–14
(E.D.N.Y. July 3, 2019)); Perez Garcia v. Hirakegoma Inc., No. 17 CV 7608, 2020 WL 1130765,
at *11.

Plaintiff Santos claimed to have begun working for the defendants in approximately
January 2013, and thus the first two years of his employment preceded the 2015 amendments
that raised the statutory cap for violations of both Sections 195(1) and 195(3) to its current
amount.  Since the violation of Section 195(1) that Santos suffered occurred in January 2013, at
the time of his hiring, and the 2015 amendments do not apply retroactively, the most that Santos

37

can recover for defendants' violation of Section 195(1) is $50 a week up to $2,500.  Martinez v.

Alimentos Saludables Corp., 2017 WL 5033650, at *21.  Under Section 195(3), Santos is

entitled to recover damages for defendants' failure to provide wage statements with his wages,

and he is entitled to recover up to the amended statutory limit for the violations that occurred

after February 27, 2015.  Lu v. Nisen Sushi of Commack, LLC, 2020 WL 9814084, at *10.

Exactly 56 weeks elapsed between January 1, 2013, and January 28, 2014.  Thus,

Santos's cause of action under Section 195(1) and his statutory right to recover $2,500, the

maximum amount allowable under the statutory provision in effect at the time for defendants'

violation of Section 195(1), accrued before January 28, 2014.  Since there is a six-year statute of

limitations applicable to violations of Section 195(1), which occur at the time of hiring, Santos

was required to file his claim on or before January 1, 2019, exactly six years after the date that he

was hired and did not receive proper notice under Section 195(1).[9]  Accordingly, the Court finds

that Santos's claim for damages arising under Section 195(1) is time barred.  Escalante v.

Lonestar Sports Bar & Grill, Inc., No. 21 CV 3900, 2021 WL 5084063, at *2 (E.D.N.Y. Nov. 2,

2021).

Santos claims to have worked from March 1, 2015, through November 2019 without

receiving wage statements as required by Section 195(3).  Since defendants' violation or Section

195(3) accrued anew with each failure to provide a wage statement with the payment of Santos's

wages, and Santos was both paid after February 27, 2015 without receiving a wage statement and

---

[9] Although the version of Section 195(1) in effect between January 1, 2013, and February 27, 2015 also
required that employers provide their employees with notice that conformed with Section 195(1) annually, there is
no private cause of action to enforce violations of that requirement.  Gamero v. Koodo Sushi Corp., 272 F. Supp. 3d
481, 510 n.13 (S.D.N.Y. 2017), aff'd, 752 F. App'x 33 (2d Cir. 2018) (quoting Yuquilema v. Manhattan's Hero
Corp., No. 13 CV 461, 2014 WL 4207106, at *10–11 (S.D.N.Y. Aug. 20, 2014), report and recommendation
adopted, No. 13 CV 461, 2014 WL 5039428 (S.D.N.Y. Sept. 30, 2014)).

more than 20 workdays elapsed after February 27, 2015 during which defendants were in

violation of Section 195(3), Santos is entitled to the maximum award of $5,000 for defendants'

violations of that provision.  Toramall v. Manhattan Constr. Grp. LLC, No. 18 CV 1062, 2020

WL 2763737, at *5 (S.D.N.Y. May 28, 2020), report and recommendation adopted, No. 18 CV

1062, 2020 WL 6482796 (S.D.N.Y. Nov. 4, 2020) (holding that plaintiffs who began working

for defendants between 2009 and 2014, and whose employment concluded between July and

September 2015, were all entitled to the statutory maximum of $5,000 under the amended statute

because they worked for more than 20 days after the statutory limit was increased); Rosales v.

Low Bid, Inc., No. 17 CV 3183, 2018 WL 3468710, at *9 (E.D.N.Y. July 3, 2018), report and

recommendation adopted, No. 217 CV 03183, 2018 WL 3468697 (E.D.N.Y. July 18, 2018)

(holding that plaintiffs who began working for defendants in 2006, 2007 and 2010 and were all

fired on March 15, 2016 without ever receiving wage statements were entitled to the statutory

maximum of $5,000 under the amended statute because they worked for more than 20 days after

the statutory limit was increased); Martinez v. Alimentos Saludables Corp., 2017 WL 5033650,

at *21-22 (holding that plaintiffs that began working for defendants in 2002, 2003, and 2004 and

whose employment concluded in April 2016 were each entitled to the statutory maximum of

$5,000 under the amended statute because they worked for more than 20 days after the statutory

limit was increased).

Each of the other plaintiffs began working for defendants after February 27, 2015, and

thus the higher award limit applies to their claims under both NYLL §§ 195(1) and (3).

Moreover, each of the plaintiffs other than Velasquez worked more than 100 days during their

employment with defendants, and for these plaintiffs, a penalty of $50 for each day worked

without a wage notice and $250 for each day worked without a wage statement would therefore

exceed the $5,000 statutory cap for violations of each provision.  NYLL §§ 198(1-b), (1-d).

Plaintiff Velasquez began working for the defendants in August 2019 and worked for

defendants through October 2019 for a total of 72 full days.  As Velasquez only worked for 72

full days, his total award for defendants' failure to provide a notice of his rate of pay at the time

of hiring under NYLL § 195(1)(a) would be $3,600.  NYLL § 198(1-b).  Velasquez worked

more than 20 days without receiving a wage statement, however, and is thus entitled to an award

up to the $5,000 statutory cap under Section 195(3) for defendants' failure to provide him with

wage statements.  NYLL § 198(1-d).

Accordingly, it is respectfully recommended that each plaintiff except Santos and

Velasquez receive $5,000 for the violations of NYLL § 195(1), and that all plaintiffs receive

$5,000 for the defendants' violation of NYLL § 195(3).  Thus, with the exception of plaintiffs

Santos and Velasquez, it is respectfully recommended that every plaintiff receive a total of

$10,000 per plaintiff for violations of NYLL's Wage Statement and Wage Notice provisions.  It

is recommended that plaintiff Santos receive only $5,000 under NYLL § 195(3).  It is

recommended that Velasquez receive $3,600 under NYLL § 195(1) and $5,000 under NYLL §

195(3) for a total of $8,600.

3) <u>Liquidated Damages Under the NYLL</u>

Plaintiffs also seek liquidated damages for the underpayment of their overtime wages

pursuant to the NYLL.  (Compl. ¶¶ 188, 122).

The FLSA and NYLL provide for liquidated damages for wage-claim violations,

calculated in an amount equal to 100% of the wage underpayments.  29 U.S.C. § 216(b); NYLL

§§ 198(1-a) and 663(1).  Although plaintiffs have proven that they were not paid the proper

overtime wages under both the FLSA and the NYLL, plaintiffs "are not entitled to recover twice for the same injury." Charvac v. M & T Project Managers of New York, Inc., No. 12 CV 05637, 2015 WL 5475531, at *4 (E.D.N.Y. June 17, 2015), report and recommendation adopted as modified, No. 12 CV 5637, 2015 WL 5518348 (E.D.N.Y. Sept. 17, 2015) (internal quotation marks and citations omitted); Llolla v. Karen Gardens Apartment Corp., No. 12 CV 1356, 2014 WL 1310311, at *11 (E.D.N.Y. Mar. 10, 2014), report and recommendation adopted as modified, No. 12 CV 1356, 2014 WL 1311773 (E.D.N.Y. Mar. 28, 2014). See also Jin M. Cao v. Wu Liang Ye Lexington Rest., Inc., No. 08 CV 3725, 2010 WL 4159391, at *3 (S.D.N.Y. Sept. 30, 2010) (holding that "[a]lthough plaintiffs are entitled to recover unpaid minimum wages and overtime pay under both the FLSA and the Labor [L]aw, they may not recover twice"). Thus, having established wage violations under both laws, plaintiffs "may recover under the statute which provides the greatest amount of damages[.]" Charvac v. M & T Project Managers of New York, Inc., 2015 WL 5475531, at *4 (quoting Jiao v. Shi Ya Chen, No. 03 CV 0165, 2007 WL 4944767, at *17 (S.D.N.Y. Mar. 30, 2007)).

Prior to November 24, 2009, an employee could recover liquidated damages under the NYLL if the underpayment was found to be willful. N.Y. Lab. Law § 663(1) (1967). However, an amendment to the NYLL, effective November 24, 2009, "incorporated the federal standard" and shifted the burden of proving good faith to the employer. Hengjin Sun v. China 1221, Inc., No. 12 CV 7135, 2016 WL 1587242, at *3 (S.D.N.Y. Apr. 19, 2016) (quoting Galeana v. Lemongrass on Broadway Corp., 120 F. Supp. 3d 306, 317 (S.D.N.Y. 2014)). Under both statutes, the employer now bears the burden of proving good faith and reasonableness. Under the NYLL's liquidated damages provision, "courts have not substantively distinguished the federal standard from the current state standard of good faith." Inclan v. New York Hosp. Grp.,

Inc., 95 F. Supp. 3d 490, 505 (S.D.N.Y. 2015) (citing He v. Home on 8th Corp., No. 09 CV 5630, 2014 WL 3974670, at *7 n. 19 (S.D.N.Y. Aug. 13, 2014); Eschmann v. White Plains Crane Serv., Inc., No. 11 CV 5881, 2014 WL 1224247, at *9 (E.D.N.Y. Mar. 24, 2014)). Accordingly, the employer's burden of proving good faith "is a difficult one, with double damages being the norm and single damages the exception."  Gortat v. Capala Bros., 949 F. Supp. 2d 374, 380 (E.D.N.Y. 2013) (quoting Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 142 (2d Cir. 1999)) (awarding 100% liquidated damages under the FLSA standard).

Since the defendants have chosen not to appear in this action and have not established that they had a good faith basis to believe that their underpayment of wages complied with the NYLL or the FLSA, the Court respectfully recommends that plaintiffs be awarded liquidated damages in an amount equal to the amount of overtime pay owed to each plaintiff under the NYLL.  Although plaintiffs prevailed under both state and federal law, "the law providing the greatest recovery will govern."  (Charvac v. M & T Project Managers of New York, Inc., No. 12-CV-05637, 2015 WL 5475531, at *4) (quoting Wicaksono v. XYZ 48 Corp., No. 10 CV 3635, 2011 WL 2022644, at *3 (S.D.N.Y. May 2, 2011), adopted by, 2011 WL 2038973 (S.D.N.Y. May 24, 2011)); Maldonado v. La Nueva Rampa, Inc., No. 10 CV 8195, 2012 WL 1669341, at *5 (S.D.N.Y. May 14, 2012).

Here, because NYLL also allows for an award of interest as addressed below, and therefore provides the greater recovery, it is respectfully recommended that plaintiff Bustillo be awarded liquidated damages in the amount of $127,509.84, plaintiff Acosta be awarded liquidated damages in the amount of $15,761.20, plaintiff Santos be awarded liquidated damages in the amount of $101,330.84, plaintiff Isaula be awarded liquidated damages in the amount of $317,048.51, plaintiff Ostilio be awarded liquidated damages in the amount of $69,678.36,

plaintiff Velasquez be awarded liquidated damages in in the amount of $2,527.27, plaintiff Alonzo be awarded liquidated damages in the amount of $19,052, plaintiff Sevilla be awarded liquidated damages in the amount of $50,239.07, plaintiff Pacheco be awarded liquidated damages in the amount of $7,456.45, and plaintiff Mendoza be awarded liquidated damages in the amount of $15,557.03, which equals the amount of unpaid overtime wages each plaintiff is owed.

III.    Damages Chart

| Plaintiff | Overtime Wages | Liquidated Damages | Wage Statement Penalty | Total |
|-----------|----------------|--------------------|------------------------|-------|
| Bustillo | $127,509.84 | $127,509.84 | $10,000 | $265,019.68 |
| Acosta | $15,761.20 | $15,761.20 | $10,000 | $41,522.40 |
| Santos | $101,330.84 | $101,330.84 | $5,000 | $207,661.68 |
| Isaula | $310,567.31 | $310,567.31 | $10,000 | $631,134.62 |
| Ostilio | $69,678.36 | $69,678.36 | $10,000 | $149,356.72 |
| Velasquez | $2,527.27 | $2,527.27 | $8,600 | $13,654.54 |
| Alonzo | $19,052 | $19,052 | $10,000 | $48,104 |
| Sevilla | $50,239.07 | $50,239.07 | $10,000 | $110,478.14 |
| Pacheco | $7,456.45 | $7,456.45 | $10,000 | $24,912.90 |
| Mendoza | $15,557.03 | $15,557.03 | $10,000 | $41,114.06 |

TOTAL: $1,532,958.74

CONCLUSION

The Court respectfully recommends that plaintiffs' motion for entry of a default judgment be granted, and that plaintiffs be awarded **$1,532,958.74** in damages as follows:  (1) $127,509.84 to plaintiff Bustillo, $15,761.20 to plaintiff Acosta, $101,330.84 to plaintiff Santos, $310,567.31

to plaintiff Isaula, $69,678.36 to plaintiff Ostilio, $2,527.27 to plaintiff Velasquez, $19,052 to

plaintiff Alonzo, $50,239.07 to plaintiff Sevilla, $7,456.45 to plaintiff Pacheco, and $15,557.03

to plaintiff Mendoza for unpaid overtime wages for a combined total of $719,679.37; (2)

$10,000 to each plaintiff in penalties for wage notice and wage statement violations except for

Santos, who should receive $5,000, and Velasquez, who should receive $8,600, for a combined

total of $93,600; (3) $127,509.84 to plaintiff Bustillo, $15,761.20 to plaintiff Acosta,

$101,330.84 to plaintiff Santos, $310,567.31 to plaintiff Isaula, $69,678.36 to plaintiff Ostilio,

$2,527.27 to plaintiff Velasquez, $19,052 to plaintiff Alonzo, $50,239.07 to plaintiff Sevilla,

$7,456.45 to plaintiff Pacheco, and $15,557.03 to plaintiff Mendoza in liquidated damages for a

combined total of $719,679.37.

　　　　Additionally, the Court respectfully recommends that plaintiffs are entitled to post-

judgment interest and reasonable attorney's fees and costs.  However, because plaintiffs have not

included calculations for their attorney's fees, the Court recommends that plaintiffs be allowed to

supplement their calculations within 30 days from the filing of this Report and Recommendation.

The Court further recommends that defendants be held jointly and severally liable for the

judgment.

　　　　Any objections to this Report and Recommendation must be filed with the Clerk of the

Court within fourteen (14) days.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); see also

Fed. R. Civ. P. 6(a), (e) (providing the method for computing time).  Failure to file objections

within the specified time waives the right to appeal the District Court's order.  See, e.g., Caidor

v. Onondaga Cty., 517 F.3d 601, 604 (2d Cir. 2008) (explaining that "failure to object timely to a

. . . report [and recommendation] operates as a waiver of any further judicial review of the

magistrate [judge's] decision").

Plaintiffs are directed to serve this Report and Recommendation on the defendants and provide evidence on the docket of doing so through the Electronic Case Filing (ECF) system immediately.  The Clerk is directed to send copies of this Report and Recommendation to the parties either electronically through ECF system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
       February 25, 2022

                                          /s/ Cheryl L. Pollak
                                          Cheryl L. Pollak
                                          Chief United States Magistrate Judge
                                          Eastern District of New York

45